IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| DANVILLE COMMERCIAL INDUSTRIAL STORAGE, LLC, and NORTH AMERICAN MOLD TECHNOLOGY, LLC, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | ) Case No.: 4:18cv00050-JLK<br>) |
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, JAMES PEBBLES, HAYWOOD PARKER, IN-LINE CONSULTING, LLC, KIM E. WINCHELL, AND H.B. FISHMAN & CO., INC. | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | ) |

**RESPONSE MEMORANDUM OF PLAINTIFFS, DANVILLE COMMERCIAL INDUSTTRIAL STORAGE, LLC AND NORTH AMERICAN MOLD TECHNOLOGY, LLC, TO THE MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS OF DEFENDANTS SELECTIVE INSURANCE COMPANY AND JAMES PEBBLES (DOCKET NO. 21)**

Come the Plaintiffs, Danville Commercial Industrial Storage, LLC ("DCIS") and North American Mold Technology, LLC ("NAMT"), by counsel, and hereby respond to the Memorandum in Support of the Motion to Dismiss by Defendants Selective Insurance Company [sic][1] and James Pebbles (DN 21) as follows.

**PRELIMINARY OBSERVATIONS**

As part of their Memorandum, Defendants Selective Insurance Company of South Carolina ("Selective") and James Pebbles ("Pebbles") offer up a "Statement of Pertinent Allegations" in an effort to lay a foundation for an analysis of its issues with regard to "Counts III, IV and IV of the

---

[1]The full name is Selective Insurance Company of South Carolina.

1

Complaint." (DN at 1.) The reference to the second Count IV is understood to mean Count V of the Complaint.

Notwithstanding 114 numbered paragraphs of factual allegations and comprehensive exhibit attachments ranging from A to O, Selective and Pebbles submit that only 14 points are relevant to the arguments made. And, while acknowledging that, for purposes of its Motion to Dismiss, all allegations must be taken as true, they nonetheless misstate select allegations and completely ignore others to favor their posturing.

When it comes to Rule 12(b)(b) Motions to Dismiss, "[i]n addition to the complaint, the court may also examine 'documents incorporated into the complaint by reference, and matter of which a court may take judicial notice.'" *Skillstorm, Inc. v. Electronic Data Sys., LLC,* 666 F. Supp. 2d 610, 615 (E.D. VA 2009) *quoting Tellabs, Inc. v. Makor Issues Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). Indeed, the many factual allegations concerning the conduct of Pebbles have a direct bearing on issues raised with regard to alleged pleading deficiencies claimed.

Selective and Pebbles avoid mentioning that that Pebbles exhibited a pattern of conduct designed to minimize and/or deny loss claims and the scope of losses. He, together with the co-defendants, developed erroneous data upon which he hung his and Selective's hats with regard to claim handling. This, notwithstanding his (and, thus, Selective's) prior and subsequent awareness of and/or the presentation to Pebbles and Selective of real, pertinent, relevant and site-specific data.

Lyle Hogan of Fincastle Engineering was the first engineer on site post-loss to address the need for temporary repairs. His report, dated August 9, 2016, is attached as Exhibit B to the Complaint. His first-hand observations of the collapsed area led him to record "that this particular region did not appear to contain entrapped water" and "[a]gain, wet roof insulation was not

recorded in the collapse zone." (DN 12 Ex B at 2). He offered his expert opinion that the roof collapse was due to the "extraordinary rainfall activity, likely approaching 'white-out' conditions for a period" in combination with some building design/structure issues in vogue at the time of original construction. *Id.* Of significance, there is no mention of "poor maintenance" as a contributing or overriding factor. Hogan also identified that steel decking "was moderately pitted, but much of it was on the underside – suggesting a corrosive environment area from prior manufacturing activities." *Id.* Hogan did not equate the pitting with any notions of trapped moisture from above. Hogan's report was promptly shared with Pebbles and re-shared with the filing of the Proof of Loss.

Notwithstanding formal notification that

1. There was no wet insulation in the collapsed area;

2. There had been an extraordinary rain event approaching "white-out" conditions;

3. Pitting on steel decking was evidence of a prior corrosive warehouse environment and not due to the notion of prior trapped moisture in roof insulation from above,

Selective commissioned Kim Winchell and H.B. Fishman, Inc. to prepare not one but two reports. The first, dated November 14, 2016 was based on onsite visits on October 20 and 21 and November 1 and 2, 2016[2] as well as a meeting with Haywood Parker on October 20, 2016. Winchell visited the loss site more than 100 days post-loss and after reports of extensive roof leaks post-July 3, 2016 were shared with Pebbles. The second, dated November 18, 2016, consisted of a compilation of select weather data gleaned online associated with the Danville Airport some seven miles from the loss location. It is suggested that the Court can take judicial notice that weather data for a

---

[2]The Complaint contains a typographical error at ¶ 49 with the year referenced in one place as 2018, but elsewhere as 2016. To be clear, all references should be understood to be 2016.

3

location seven miles aware is not a true indicator of the actual weather at the loss location and that the best evidence is the actual available data for the GPS coordinates of the loss location. That data was secured and provided by Howard Altshule and Forensic Weather Consultants, LLC. (DN 13-1 Ex. I.)

Notwithstanding having the Hogan and Altshule reports in hand, Selective, through Pebbles, with help from Winchell and Parker via their reports and communications (and, it should be noted, ignoring the report of Carville Evering of Callan Salvage & Appraisal Co., Inc. with regard to damaged personal property), continues to rely on a flawed and fabricated factual account to justify its intransigence and refusal to act on the Proofs of Loss submitted over one year ago by DCIS and NAMT.

Turning to numbered ¶ 10 of the Statement of Pertinent Allegations, it is not an accurate recitation of the facts as alleged in the Complaint and attached exhibits. More particularly, Pebbles and Selective were provided with a calendar listing of 56 separate days **post-July 3, 2016** that required investigation and redress of leaks. *See* DN 13-2 Ex. J for each calendar date circled in red. To represent that such data is evidence of "prior" roof leaks is, sadly, further evidence of Pebbles and Selective attempting to recategorize factual data (and, in this, the factual allegations taken as true in the Complaint) in a false and misleading fashion and then repeat it enough times in the hopes that it becomes accepted as true data. Indeed, Selective and Pebbles were provided with two invoices – *see* DN 13-3 Ex. K – for roof repairs pre-July 3, 2016 on May 23, 2016 and June 29, 2016 totaling $680.00 and $222.00 respectively. Exhibit K does not justify the representation made of "fifty-eight (58) **prior** roof leaks" nor does it provide credence for reliance by Pebbles and Selective on notions of "a pre-existing issue resulting from a poorly maintained roof surface." DN 21 at 6.

4

Selective's and Pebbles' numbered ¶¶ 11 and 13 are not accurate as well. DCIS submitted its Proof of Loss as the measure of its loss. "[S]o that it can pay to have an entirely new roof placed on the Warehouse" is not part of any allegation made by DCIS and NAMT in numbered ¶¶ 93-95 of the Complaint and is further spin-doctoring on the part of Selective and DCIS. In Selective's and Pebbles' numbered ¶ 13, it is represented to that Selective "has not agreed to pay the remaining claims in either Proof of Loss." While this could be technically correct if one wants to slice and dice wording, such is not a factual representation made in the Complaint. Rather, the factual representation in the Complaint that must be taken as true for purpose of the pending motion is as contained in ¶ 108: "Selective has not responded nor provided any communications as to the status of its assessments of the two sworn proofs of loss now almost nine months[3] since each was tendered to Selective." (DN at 18.)

**ARGUMENT**

A. **Do the Tort Claims of NAMT Fail as a Result of the Economic Loss Rule?**

Selective and Pebbles argue that Counts III, IV and V of the Complaint are tort claims asserted by NAMT and all are barred by the Economic Loss Rule in Virginia. Some boilerplate case law citations are provided along with several efforts to label the relationship between Selective (and Pebbles) with NAMT as premised solely on the basis of the insurance contract and, thus, solely contractual in nature. The damage loss at issue under each of the three counts is the loss of a long-term, long-standing bailor-bailee (with maintenance and repair work as well) between a Goodyear Tire and Rubber Company ("Goodyear") and NAMT with regard to airplane tire molds used at the Goodyear facility in Danville, Virginia. In essence, this is a consequential damage loss claim outside the agreed coverage values in the insurance contract.

---

[3]As to Complaint was filed in July, that actual passage of time is now over one year.

In *Kindred v. McLeod*, 2010 WL 4814360, at *7 (W.D. Va. Nov. 19, 2010), District Judge Moon addressed this issue and provided a blueprint for case-by-case resolution:

> In order to determine whether a claim is subject to the restrictions imposed by the economic loss rule, a court must first determine the nature and source of the duty allegedly violated. *Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558 (1998). If the duty does not exist absent an agreement establishing that duty, then it is a duty based in contract; if the duty arises from the relationship of the parties irrespective of any agreement, then any action for breach of that duty sounds in tort. *Oleyar v. Kerr*, 217 Va. 88, 89-90 (1976). "Thus, if, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply." *City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 446 (4th Cir. 1990).

The subject matter of all three Counts, is, as stated above, the loss, on the part of NAMT, of its contract with Goodyear with regard to the latter's airplane tire molds. The bases advanced to remedy that loss and assign responsibility to Selective (Count III) and Selective and Pebbles and the other four defendants (Counts IV and V) are tortious interference with a contractual relationship (Count III), common law conspiracy (Count IV) and statutory conspiracy (Count V).

Per District Judge Moon's blueprint, the first order of business is the nature of each of the three claims. All sound in tort and Model Virginia Jury Instructions for tortious interference with a contractual relationship and statutory conspiracy can be found under the "Miscellaneous Torts" section of the model instructions. The source of each duty is likewise in tort without restriction, the first two under the common law and the last by way of statutory creation. These duties are not selective or restrictive in the sense that that only spring into existence if certain conditions can be met – i.e., privity of contract or fiduciary relationship. As such, the duties not to interfere with one's contractual relations and not to engage with others to cause harm to an another are universally present even if a contractual relationship exists.

6

Insofar as the applicability of the Economic Loss Rule, that is as far as the analysis need go per *Kindred*. As such, the Economic Loss Rule is not a bar to NAMT's Counts III, IV and V in the Complaint.

Selective's and Pebbles' citation of *A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins.Co.*, 798 F.2d 669 (4th Cir. 1986) in support of its argument on the Economic Loss Rule is an interesting one. The case is primarily about an insurance loss and verdict against an insurance company and the bad faith aspects of Nationwide's claim handling. Tucked toward the end of the opinion is the following:

> But if an indemnitor has violated the contractual duty of good faith, the indemnitee may recover **full general and consequential damages**. *See Board of Supervisors of Stafford County v. Safeco Insurance Co. of America*, 226 Va. 329, 310 S.E.2d 445, 450 (1983) (predicating surety's liability for consequential damages on finding of bad faith default); *see also Beck v. Farmers Insurance Exchange*, 701 P.2d [795,] . . . at 801-802 [Utah 1985)]; *Lawton v. Great Southwest Fire Insurance Co.*, 392 A.2d [576,] . . . 579-580 [(N.H. 1978)}; *Reichert v. General Insurance Co.*, 59 Cal. Rptr. 724, 428 P.2d 860, 864 (1967), *vacated on other grounds*, 68 Cal. 2d 822, 69 Cal. Rptr. 321, 442 P.2d 377 (1968). Had A & E proved foreseeable losses, not susceptible to mitigation, resulting from Nationwide's bad faith refusal to pay, Virginia contract law would make A & E whole.

*Id*. (emphasis added). Should the Court disagree with the legal argument made here by NAMT, request is made for leave to amend to ensure that this claimed loss can proceed forward as part of Count II.

### B. Can Count III for Tortious Interference Survive?

Having passed the test of whether the nature and source of duty for Count III sounds in tort or contract vis-à-vis the Economic Loss Rule, NAMT believes, contrary to the arguments and representations of Selective and Pebbles, that its factual allegations satisfy the four elements as set forth in *Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).

7

The first element is the existence of a valid contractual relationship. Reference to the business operations and NAMT and its relationship with Goodyear can collectively be seen or gleaned from ¶¶ 7, 40, 41, 93, 96, 140, 156, 157, 158, 159 and the Proof of Loss attached as Exhibit O (DN 14-6). Further, Pebbles himself acknowledges the relationship in his letter of December 19, 2016 (DN 12-7 Ex G at 3), when he writes, "Last, during our meeting I questioned you on when we should expect to receive the requested documentation relating to the Goodyear molds."

The second element has to do with knowledge of the relationship on the part of Selective/Pebbles. Again, Pebbles' letter of December 19, 2016 would appear to satisfy any concerns here when he writes:

> You stated that you did not believe the insured would be able to secure the requested documents they 'did not want to disrupt anything with Goodyear.' Please understand that no payment can be for the cost of remediation of the molds without the requested documentation.

*Id*.

The third element concerns the intentional interference that induced the termination of the relationship with Goodyear. Pebbles' letter of December 19, 2016 (DN 12-7 Ex. G) again adds facts. Selective was demanding documents – not believed to be necessary under the contract of insurance and resolution of this particular claim – to aggravate the relationship between NAMT and Goodyear by requesting disclosure of documents from Goodyear via NAMP relating to sensitive and proprietary goods owned by Goodyear. Pebbles offered no compromise to remedy the ticklish situation and understood that by being stubborn, he could finagle a denial of a claim on alleged lack of cooperation and, thus, frustrate the purpose of the insurance contract and promote the finances of Selective.

The last element goes to the damages of NAMT which were provided, in the form of revenue lost, at ¶ 160 when compared to immediate prior years.

Selective and Pebbles also claim that NAMT failed to allege improper methods as part of its cause of action and such is fatal to this Count. However, while Count III starts at numerical ¶ 154, it adopted and reiterated the prior 153 paragraphs as if fully set out therein. Within those 153 paragraphs all the factual allegations – taken as true at this time – of the intentional creation of false and misleading information for the very purpose of delaying and denying full compensation for the losses involved and claims made.

While NAMT believes that it has satisfied the pleading requirements to the level necessitated under federal procedural law, if the Court disagrees, NAMT requests the opportunity to amend the Complaint to flesh out the factual information of its allegations prior to a final ruling by the Court.

Beyond these four proof requirements, Selective and Pebbles go further and insist that there is a fifth, unstated element associated with tortious interference and trots out *17th Street Associates v. Markel Intern Ins. Co.*, 373 F. Supp. 2d 584 (E.D. Va. 2005) as its star case. Applied to the facts at hand, what *17th Street* requires is that there be the establishment of a competitive basis between the interferor (Selective and Pebbles) and the party interfered with, NAMT. If that were the law in Virginia or the Western District of Virginia, NAMT would be compelled to agree. But *17th Street* is a decision from the Eastern District of Virginia that is not binding in the Western District of Virginia. Indeed, when given the opportunity to evaluate this very holding in *Livia Props., LLC v. Jones Lang LaSalle Americas, Inc.,* No. 5:14-00053, 2015 WL 4711585 at * 6 (W.D. Va. Aug. 7, 2015), the Court declined to adopt that holding as the law in the Western District. In doing so, it observed that

> the Virginia Supreme Court has never stated that a competitive relationship between the parties is a prerequisite to a tortious interference claim like that alleged herein.

*Id.*

The *Livia Props* Court went on to observe that a Virginia Circuit Court in *Foster v. Wintergreen Real Estate Co.*, 81 Va. Cir. 353, 2010 WL 11020447, *8 (Va. Cir. Nov. 16, 2010) made a similar ruling when overruling a demurrer on the grounds that a showing of a competitive relationship between the party interfered with and the interferor was not required as such had not been adopted by the Supreme Court of Virginia. Further, the *Livia Props* Court. 2015 WL 4711585 at *6, found the following reasoning from a court in Connecticut persuasive and instructive:

> To hold a defendant who has tortuously interfered with another's business relations free from liability solely because the defendant has not injured a competitor is contrary to the law. . . . The lack of a competitive relationship can in no way justify unwarranted interference with another's business relations. Furthermore, a plaintiff's injuries in such a situation are no less real because they are caused by a noncompetitor.

*Conrad v. Erickson*, 41 Conn. App. 243, 246, 675 A.2d 906 (Conn. 1996).[4]

Accordingly, NAMT submits that the fifth, unstated element is not a required pleading component or proof element in the Commonwealth of Virginia or the Western District of Virginia.

### C. Are Counts IV and V for Common-Law Conspiracy and Statutory Conspiracy, Respectively, Barred by the Intracorporate Immunity Doctrine?

Selective and Pebbles argue that Counts IV and V must fail because a corporation cannot conspire with its own employee. If these two Counts were just against Selective and Pebbles, NAMT would agree. However, both Counts include four additional defendants, or two set of twos – Winchell and his employer, HB Fishman, and Parker and his employer, IN-Line Consulting.

---

[4] To the credit of counsel for Selective and Pebbles, the *Livia Props* case is called to the attention of the Court at the end a long string of case citation with a "*but see*." The other cited cases are all from the Eastern District of Virginia save one, which is a Virginia Circuit Court decision that predates *Foster v. Wintergreen* cited in *Livia Props.*

Selective and Pebbles thus expand their argument on the theory that the other four defendants, because they were hired to perform select tasks as independent experts and prepare reports for consideration and use by Selective, are now Selective's agents and encompassed within the Intracorporate Immunity Doctrine.

First, a look at the allegations in the Complaint reveals that at no time is there any actual assertion that either Winchell or Parker was hired as an employee of Selective. What is clear from the allegations in the Complaint is that Winchell is a Senior Associate and employee of HB Fishman (¶ 14) and Parker is an estimator and employee of IN-Line Consulting (¶ 12). Further, the allegations in the Complaint only go so far as to indicate that Selective, through Pebbles, retained both for limited purposes. At no point is there any allegation that Selective had the power to control the activities and actions of Winchell and HB Fishman or Parker and IN-Line Consulting. It is the power of control that differentiates between a true agency relationship and that of an independent contractor as made clear by Virginia Model Jury Instruction No. 8.100:

> **Definition of Independent Contractor**
>
> An independent contractor is a person who is engaged to produce a specific result but who is not subject to the control of the employer as to the way he brings about that result.

In *Hadeed v Medic-24, Ltd*, 237 Va. 277, 288, 377 S.E.2d 589, 594-95 (1989), the Supreme Court of Virginia identified four factors as important on the issue of a master-servant relationship versus that of an independent contractor with the fourth – the issue of control – as determinative.

> Four factors enter into determination of the question whether a master-servant relationship exists within the contemplation of the doctrine of respondeat superior, (1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative.

The cases cited by Selective and Pebbles generally encompass true employer-employee situations and are not akin to or have an affinity of similarity to the situation at hand. In the absence of allegations establishing a relationship beyond that of an independent contractor, that is far as any interpretation and assessment of the facts in the Complaint can go.

Accordingly, Intracorporate Immunity as a basis to dismiss Counts IV and V must fail.

**D. The Underlying Tortious Conduct for Counts IV and V**

Selective and Pebbles argue that they have no clue as to the underlying tortious conduct that might give rise to the conspiracy claims, but the viability of the tortious interference claim, as discussed earlier, puts a pin in that argument. The effort to interfere with the existing contract – even if viewed as a business expectancy -- between Goodyear and NAMT serves as the basis for the conspiracy. *See Dunlap v Cottman Transmission Sys., LLC*, 287 Va. 207, 754 S.E.2d 313 (2014).

**E. Count IV for Common Law Conspiracy**

Selective and Pebbles appear to be claiming that NAMT has not satisfied the pleading requirements for common law conspiracy (though it is hard to tell since its supporting memorandum seems to lump discussion of both conspiracy claims in one discussion). However, if the issue here is satisfaction of the two elements – a combination of two or more persons for the purpose of willfully and maliciously injuring NAMT in its business plus damages, NAMT believes that it has met its pleading burdens. At a minimum. Pebbles/Selective hired Winchell/HB Fishman to conduct a roof inspection and generate a weather analysis report. The two had worked together before. It is a matter of common sense and of judicial notice that experts that work for insurers quickly learn what information insurers like to receive and satisfying insurers promotes additional job activity in the future on other projects.

12

That being said, Winchell created a report for Pebbles/Selective that alleged roof moisture issues were solely the result of poor roof maintenance and pre-existing issues based, primarily, on underside corrosive observations on steel decking made by him. Winchell did not endeavor to determine the history of the warehouse in terms of usage or maintenance – i.e., the corrosive environment within the warehouse when operated by Corning – but understood that with such a report, premised on inaccurate or outright fraudulent interpretations, Pebbles/Selective would be able to minimize Selective's exposure to the its insureds and their losses.

Similarly, when asked to generate weather data, Winchell did not decline the request due to a lack of qualification and engaged in an effort for a location – the Danville Airport – over seven miles from the warehouse in question. He then presented as factual to the loss location and opined that only 0.94 inches of rain fell on the warehouse on July 3, 2016. He went on to assert that there were day before and after the loss with higher daily rainfall amounts.

At no point, apparently, did Winchell consider the absurdity of claiming only 0.94 inches of rain led to the roof collapse and other losses at the warehouse. Winchell knew this information, albeit inaccurate and false to the location at issue, would be welcomed by Pebbles and allow Pebbles to take rigid positions with regard the claims of NAMT and DCIS. Winchell made no effort to secure data from the primary weather source, the National Weather Service, not sought to harmonize the data he generated with the physical realities of what happened on July 3, 2018.

Pebbles gladly took Winchell's reports and used heavily to issue his December 19, 2016 letter knowing full well, as a experienced property adjustor, that the first report was at odds with Hogan's report as the first expert on the scene, and the weather report was inconsistent with the observations of Hogan as recorded in his report and the eyewitness accounts (including photographs) of the damage to the warehouse. These two willfully and maliciously went about

13

creating a false account of factual data upon which Pebbles, for Selective, then used knowing, full well, this would delay redress of the damage to the warehouse and redress of the damage to the Goodyear molds in the possession of NAMT and, by way of other communications to Pebbles, that unrepaired environment for the tire molds was likely to lead to termination of Goodyear's contract with NAMT.

The foregoing, it is submitted, can be gleaned from the lengthy discussion of the actions of Pebbles and Winchell in the numbered paragraphs of the Complaint as well as from the exhibits attached thereto.

### F. Count V for Statutory Conspiracy

Selective and Pebbles assert that legal malice has not been identified. Per *Commercial Business Sys., Inc. v BellSouth Servs., Inc.*, 249 Va. 39, 47, 453 S.E.2d 261, 266-67 (1995), all that is necessary is defendant acted intentionally, purposefully and without lawful justification. In the preceding section, NAMT reviewed its allegations of the conduct of Pebbles and Winchell and how they intentionally, purposefully and without lawful justification went about creating a false and fraudulent account of the condition of the warehouse prior to July 3, 2016 and the weather event itself all to justify a hardline stance with regard to claims resolution knowing that such a posture would cause injury to NAMT and harm to NAMT's relationship with Goodyear.

The proof requirement on NAMT and, thus, the pleading requirement, does not mandate a showing the primary and overriding purpose of the each conspirator was to injure NAMT in its trade or business. *Id*. Further, with regard to statutory conspiracy, it is not required

> that the co-conspirator act with legal malice. Rather, the statute simple requires that one party, acting with legal malice, conspire with another to injure the plaintiff.

*Va. Vermiculite Ltd. V. W. R. Grace & Co.-Conn.*, 144 F. Supp. 2d 558, 601 (W.D. Va. 2001).

With regard to Selective's and Pebbles' issues as to unity of action, the foregoing discussion, all evident from the allegations in the Complaint would appear to provide a showing that Pebbles and Winchell acted in concert with regard to the creation of and use of false data all meant to cause harm to NAMT and its business operations.

If, however, the Court is of the view that factual allegations are lacking that, if present, would allow NAMT's conspiracy claims to move forward, NAMT requests leave to amend its Complaint in an effort to satisfy such concerns before any final ruling by the Court.

## CONCLUSION

DCIS and NAMT hope that, with this Response Memorandum, they have successfully addressed all the issues raised by Selective and Pebbles and, accordingly, request that this Court deny their Motion to Dismiss.

    Respectfully submitted,

    DANVILLE COMMERCIAL INDUSTRIAL
    STORAGE, LLC and
    NORTH AMERICAN MOLD TECHONOLGY,
    LLC

    By:   /s/ Anthony H. Monioudis

Anthony H. Monioudis, Esq. (VSB 32691)
**Counsel for Plaintiffs,**
  **Danville Commercial Industrial Storage, LLC and**
  **North American Mold Technology, LLC**
Anthony H. Monioudis, Esq., PLC
341 Main Street, Suite 201
Danville, VA 24541
Telephone: 434-797-8202
Facsimile: 434-835-2590
E-Mail: anthony@ahmplc.com

# CERTIFITCATE OF SERVICE

I hereby certify that on September 13, 2018, I electronically filed the foregoing Response Memorandum of Plaintiffs, Danville Commercial Industrial Storage, LLC and North American Mold Technology, LLC, to the Memorandum in Support of the Motion to Dismiss of Defendants Selective Insurance Company and James Pebbles (Docket No. 21) with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Calvin W. Folwer, Jr., Esq.   (VSB 27982)
Harold E. Johnson, Esq.   (VSB 65591)
Justin S. Feinman, Esq.   (VSB 87511)
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, VA 23219
Telephone:  804-420-6000
Facsimile:  804-420-6507
E-Mail:   wfowler@williamsmullen.com
          hjohnson@williamsmullen.com
          jfeinman@williamsmullen.com
Counsel for Defendants,
  Selective Insurance Company of South Carolina and
  James Pebbles

Andrew Biondi, Esq.
Paul B. Hlad, Esq.
Sands Anderson PC
4101 Lake Boone Trail, Suite 100
Raleigh, NC 27607
Telephone: 919-706-4212
Facsimile:  919-706-4205
E-Mail;   PHlad@sandsanderson.com
Counsel for Defendants,
  IN-Line Consulting, LLC and
  Haywood Parker

Stephan F. Andrews, Esq.   (VSB 23756)
Andrew P. Selman, Esq.   (VSB 91060)
VANDEVENTER BLACK LLP
901 E. Byrd Street, Suite 1600
Richmond, VA 23219
Telephone: 804-237-8803

Facsimile;   804-237-8801  
E-Mail:      sandrews@vanblacklaw.com  
             aselman@vanblacklaw.com  
Counsel for Defendants,  
  Kim E. Winchell and  
  H. B. Fishman & Co., Inc.

                                                      /s/   Anthony H. Monioudis