CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
DEC 18 2018
JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| DANVILLE COMMERCIAL INDUSTRIAL ) <br> STORAGE, LLC, and NORTH AMERICAN ) <br> MOLD TECHNOLOGY, LLC, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> SELECTIVE INSURANCE COMPANY OF ) <br> SOUTH CAROLINA, JAMES PEBBLES, ) <br> KIM E. WINCHELL, and H.B. FISHMAN ) <br> & CO., INC., ) <br>   ) <br> Defendants. ) | Case No. 4:18cv00050 <br><br> **MEMORANDUM OPINION** <br><br> By: Hon. Jackson L. Kiser <br> Senior United States District Judge |

This matter is before the Court on Defendants' various Motions to Dismiss [ECF Nos. 20, 23.] Following full briefing by the parties, I heard oral arguments on the motions on November 27. [ECF No. 42.] I have reviewed the pleadings, the facts and arguments of the parties, and the relevant law, making the matter ripe for disposition. For the reasons stated herein, I will grant the motions to dismiss and grant Plaintiffs fourteen (14) days to file an amended complaint, if they so choose.

I.   **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[1]

Despite a 30-page Complaint and over 800 pages of exhibits, this case is a run-of-the-mill insurance dispute. Plaintiffs Danville Commercial Industrial Storage, LLC ("DCIS"), and North American Mold Technology, LLC ("NAMT") occupied a building at 265 Corning Drive in Danville ("the property"). DCIS owned the building; NAMT leased space there. Defendant Selective Insurance Company of South Carolina ("Selective") provided a commercial insurance

---

[1] The facts are taken from Plaintiff's Complaint [ECF No. 1]. As this stage, it is appropriate to accept Plaintiff's factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

policy on the property. Defendant James Pebbles ("Pebbles") is an Executive General Adjuster and employee of Selective.

From April 1, 2016, to April 1, 2017, DCIS and NAMT were insured by Selective under Policy Number S2218036. The property was listed in the insurance policy as a covered location. During the early morning hours of July 3, 2016, portions of the property were damaged during a severe weather event.[2] As a result, a portion of the roof at the property collapsed, resulting in broken water, electrical, and gas lines as well as flooding of interior sections of the premises. (Compl. ¶ 31.)

The incident was immediately reported to Selective and assigned claim number SELE1/5890. The original adjuster's maximum adjustment authority was $250,000, but he was ultimately replaced Pebbles, an adjuster with unlimited adjustment authority. (Id. ¶ 34.)

DCIS and NAMT retained several architects and experts to represent their interests during the claims process. Lyle Hogan with Fincastle Engineering and Ralph Walden, a certified commercial roofing inspector, prepared a report dated August 9, 2016, concluding that the roof collapse was the result of multiple influences, including extraordinary rainfall activity, inadequate roof drainage, and the mass of multiple roof layers. (Compl. Ex. B.) Their conclusions were shared with Pebbles and Selective. Selective also retained several experts to assist it in determining the cause and extent of the damage at the property.

Pebbles, on behalf of Selective, also retained Carville Evering to inspect personal property of third parties in possession of NAMT that was damaged when the roof collapsed. After receiving Evering's report, Pebbles began advancing the position that there was no coverage over third-party's items in NAMT's possession at the time of the loss.

---

[2] Obviously, Selective disputes that the weather event caused the damage. Because this is before the Court on a motion to dismiss, DCIS and NAMT's version of events is accepted as true.

Around July 18, 2016, Pebbles retained Haywood Parker and In-Line Consulting to serve as a construction consultant and prepare a replacement cost estimate for the damage to the property. "Limiting himself solely to the area of the roof collapse, Parker . . . generated a 'preliminary' estimate on August 2, 2016[,] of replacement cost at $187,420.19." [Compl. ¶ 45.] Plaintiffs assert that, to date, that estimate has not been revised, amended, or finalized.

Around October 11, 2016, Pebbles retained Kim Winchell and H.B. Fishman, Inc., to prepare a Roof Inspection Report regarding the portion of the roof that had not collapsed, as well as an under-deck inspection to determine the overall condition of the roof and the existence of any additional damages. On November 14, 2016, Winchell and H.B. Fishman issued a report concluding that all areas of the roof "suffer from lack of maintenance, blistering as a result of moisture built into the roofing systems, ponding water and [sections of the roof] having outlived their intended services lives." [Compl. ¶ 50.] As a result, Winchell and H.B. Fishman ultimately concluded that moisture trapped in the roof and chronic leaks experienced post-July 3 were not causally related to the July 3 weather event.[3]

At Pebbles request, Winchell and H.B. Fishman collected and analyzed weather data from July 3, despite the fact that Winchell had no credentials as a meteorologist, weather expert, or weather consultant. Winchell provided a second report on November 18 devoted exclusively to analysis of weather data and conclusions drawn therefrom. Pebbles incorporated this report when he stated in a December 19 letter: "Mr. Winchell's report clearly shows a significant increase in precipitation prior to and post loss" and, therefore, "[t]he interior leaks you are observing are the result of excess precipitation saturating the multiple layers of roofing to a point where they become visible leaks in the building." [Compl. ¶ 66.]

---

[3] According to the Complaint, leaks from the roof had been a minor problem prior to July 3, but became a "chronic problem" requiring full-time attention post-July 3. [Compl. ¶ 51.]

- 3 -

In response to Winchell's analysis and Pebbles's letter, DCIS and NAMT hired Howard Altschule and Forensic Weather Consultants to investigate the issue of the weather at the property on July 3. Altschule concluded that, "[o]n July 3rd, 2016, . . . light to moderate and heavy rain (including some torrential downpours at times) occurred from approximately 12:29 a.m. through 1:18 a.m.. [a total of 49 minutes and that] [t]he thunderstorms were particularly intense between 12:37 a.m. and 1:11 a.m. [34 minutes] and strong downdraft wind gusts up to 50–60 miles per hour occurred at the incident location." [Compl. ¶ 71.] Altschule ultimately concluded that "2.76 inches of rain accumulated and strong downdraft wind gusts of up to 50–60 miles per hour" occurred at the property on July 3. [Compl. ¶ 74.]

Walden's[4] report addressed the impact of rapid rain water buildup, like that which occurred on July 3, its need to drain somewhere, and the causal connection of the chronic water leakage issue post-July 3. Walden concluded that the July 3rd damage and the leaks post-July 3 were caused by the July 3 weather event. [Compl. ¶ 77.] He further noted that evidence of pre-July 3 water infiltration and resulting degradation of metal decking was limited, and areas of rusting around ribs and intermediate surfaces was, in many cases, not indicative of long-term moisture migration into and onto the deck from above. [Compl. ¶ 78.] All information gathered by DCIS, NAMT, or its experts was tendered to Selective and Pebbles.

On February 2, 2017, Selective sent notice to DCIS and NAMT that it was not renewing any of its coverage on the property as a result of "unfavorable loss history and loss ratio of 1,368%." [Compl. ¶ 83.] A 1,368% loss ratio, when compared to a premium payment of $60,152.51, equates to a loss history of $882,887.02, yet Selective has not offered to Plaintiffs any evidence of how it arrived at such a calculation.

---

[4] Recall that Walden was retained by Plaintiffs.

By June 2017, despite the losses suffered by DCIS and NAMT, Selective still had not provided DCIS and NAMT with Proof of Loss forms to complete. Out of an abundance of caution, DCIS and NAMT found and completed generic Proof of Loss forms, and submitted them to Selective on June 30. Prior to the completion of the Proof of Loss, Selective hired Childress Engineering Services, Inc., for another perspective on the cause and extent of the damage at the property.

Upon receipt of DCIS and NAMT's Proof of Loss, Selective requested that they resubmit the Proof of Loss on the appropriate form. DCIS and NAMT complied on September 5, 2017. The Sworn Proof of Loss set out a claimed about of $3,937,976.77. Included in that amount is $95,615.38, which consists of labor costs to return third-party goods to their pre-July 3 condition. To date, Selective has not responded to the Proof of Loss, as required by the insurance contract.[5]

DCIS and NAMT filed suit on July 2, 2018 (which action was removed to this Court on August 9), alleging: breach of contract with DCIS (Count I); breach of contract with NAMT (Count II); tortious interference with a contractual relationship of NAMT (Count III); common law conspiracy against NAMT (Count IV); statutory conspiracy against NAMT (Count V). With regard to the tortious interference claim, NAMT alleges that Selective and the other defendants delayed action on the claim, knowing that delay would jeopardize a contract NAMT had with Goodyear to store and repair Goodyear tire molds at the property. On July 3, NAMT had 441 items of Goodyear personal property at the property for storage, maintenance, and repairs. NAMT alleges that "Selective and Pebbles intentionally delayed both payment of an initial sum and full replacement of the roof in order to put financial pressure on NAMT which was under

---

[5] According to the contract, within 30 days of receipt of a sworn Proof of Loss, Selective is to give notice of its intention to either: pay the value of the damaged property; pay the cost of repairing or replacing lost and damaged property; take all or part of the property at an agreed appraised value; or repair, rebuild, or replace with like kind. [Compl. ¶ 98.]

threat of losing Goodyear's business with regard to these particular items of personal property." [Compl. ¶ 159.]

Plaintiffs originally filed suit in the Circuit Court for the City of Danville on July 2, 2018. (See Not. of Removal ¶ 1, Aug. 9, 2018 [ECF No. 1].) Defendants removed the action to this Court on August 9. (Id.) Thereafter, Defendants Selective and Pebbles filed a Motion to Dismiss [ECF No. 20], followed shortly by a Motion to Dismiss filed by Defendants H.B. Fishman and Winchell [ECF No. 23]. Both motions were fully briefed [see ECF Nos. 21, 24, 31, 32, 34, 35.] I heard oral argument on the motions on November 27.

## II.　STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In determining facial plausibility, the court must accept all factual allegations in the complaint as true. Id. The Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the Complaint must "allege facts sufficient to state all the elements of [the] claim." Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

## III. DISCUSSION

Although Defendants' arguments are compelling and mostly meritorious, the economic loss rule bars counts III, IV, and V.

The economic loss rule holds that "a tort cannot be claimed in conjunction with a breach of contract claim unless the plaintiff shows an independent common law duty separate from the contractual duty." Pre-Fab Steel Erectors, Inc. v. Stephens, No. 6:08-cv-00039, 2009 WL 891828, at *8 (W.D. Va. Apr. 1, 2009). In Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc., the Supreme Court of Virginia[6] noted the distinction between actions that sounds in tort and those in contract:

> If the cause of the complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

256 Va. 553, 558 (1998). Under Virginia law, "a party can, in certain circumstances, show both a breach of contract and a tortious breach of duty." Id. (citation omitted). The duty "breached must be a common law duty, not one existing between the parties solely by virtue of the contract." Id. (citation omitted).

The present case falls squarely within the rule. At its core, Plaintiffs' complaint is that Selective failed to pay for the damage caused by the July 3rd storm as required by the insurance contract. Absent that contract, Selective had no duty—common law or otherwise—to pay for the damages at DCIS and NAMT's facility. Because Plaintiffs' allegations are of "mere failure to perform the contract, *i.e.*, nonfeasance," Pre-Fab, 2009 WL 891828, at *9, they sound in

---

[6] The parties agree that, in this diversity action, Virginia law applies.

contract, and tort claims arising from the same conduct are barred. Cf. Behrman v. Allstate Life Ins. Co., 388 F. Supp. 2d 1346, 1350 (S.D. Fl. 2005) (holding that Florida's economic loss rule barred a claim for civil conspiracy), aff'd, 178 F. App'x 862 (11th Cir. 2006).

In an effort to salvage their tortious interference claim, Plaintiffs argue that Defendants had a duty not to interfere with an existing contract, but that states the relevant duty far too broadly. Adopting this argument would eviscerate the economic loss rule in practice as there are a number of common law "duties" that "exist" but which, under the appropriate circumstances, cannot be pursued because of the economic loss rule. The relevant duty here is the alleged duty to pay. That duty arises under the insurance contract, and thus the economic loss rule applies.

Although Plaintiffs' conspiracy claims are barred by the economic loss rule, they also fail under the pleading standard outlined by Iqbal and Twombly.[7] Aside from the fact that Winchell and H.B. Fishman were hired by Pebbles and Plaintiffs' conclusory statements that they conspired against Plaintiffs, nothing in the Complaint, taken as true, establishes a conspiracy to injure Plaintiffs. "Plaintiff[s] must plead business conspiracy with particularity, which [they] have] failed to do here." Schlegel v. Bank of America, N.A., 505 F. Supp. 2d, 321, 329 (W.D. Va. 2007); see also Gov't Employees Ins. Co. v. Google, Inc., 330 F. Supp. 2d, 700, 706 (E.D. Va. 2004) ("[B]usiness conspiracy, like fraud, must be pleaded with particularity, and with more than mere conclusory language. The heightened pleading standard prevents every business dispute [from] becoming a business conspiracy claim."). Even if the economic loss rule did not bar Plaintiffs' conspiracy claims, the relevant pleading standards would.

---

[7] They also likely fail under the intra-corporate immunity doctrine, but the facts are insufficiently developed at this stage to rule on that defense.

## IV. CONCLUSION

Because the duty allegedly breached arose only by virtue of a contractual agreement, Plaintiffs' recourse is under the contract and may not be found in tort. Counts III, IV, and V will be dismissed. Plaintiffs will be given fourteen (14) days to file an Amended Complaint, if they so choose.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 18th day of December, 2018.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE