IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DANVILLE COMMERCIAL INDUSTRIAL STORAGE, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 4:18-cv-00050-JLK |
| | ) | |
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Danville Commercial Industrial Storage, LLC ("DCIS") submits this Memorandum in Opposition to Defendant Selective Insurance Company of South Carolina's ("Selective") Motion for Partial Summary Judgment.

## INTRODUCTION

On July 3, 2016, a massive windstorm caused substantial damage to the roof of DCIS's warehouse at 265 Corning Drive in Danville, Virginia (the "Warehouse"). While such an unexpected and destructive event is devastating to any company, it is especially so for DCIS whose business model relies on its ability to safely store large scale manufacturing equipment in the Warehouse. Recognizing this, DCIS purchased comprehensive "all risk" insurance coverage from Selective to cover exactly the sort of property damage at issue in this case. While Selective acknowledges its responsibility for a portion of the roof which collapsed during the windstorm, Selective now seeks to avoid its responsibility for the wide-ranging damage the windstorm caused beyond the area of the collapse. The only windfall in this case is the one Selective seeks as it tries to avoid its responsibility for damages under the all-risk insurance policy it issued.

Selective minimizes its heavy burden to deny its coverage under the all-risk insurance policy it issued to DCIS.  Where, as here "an insured has shown that [its] loss occurred while an insurance policy was in force, but the insurer relies on exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case…."  *Piankatank River Golf Club, Inc. v. Selective Ins. Co.*, 2009 U.S. Dist. LEXIS 31724 at 16 (E.D. Va. Apr. 15, 2009).  Selective cannot meet this heavy burden.  Indeed, Selective asks this Court to broaden the term "surface water" in a manner never done before by a court in Virginia (state or federal), by extending "water diffusing over the surface of the ground" to apply to rainwater which has accumulated on a roof.  This extension is unsupported by precedent or common sense, and, at minimum, is ambiguous under a policy which expressly refers to "collected rain on a roof" as a concept distinct from "surface water."

The only other exclusion Selective identifies, the "drain" provision, similarly does not apply to the facts of the case, and cannot justify its refusal to cover the property damage at issue. Fact disputes remain about the extent of the damages to DCIS's roof and their causation, but Selective clearly cannot prove that either of the exclusions it identifies apply to the facts of this case and this Court should reject Selective's attempt to short circuit its contractual responsibilities.

## STATEMENT OF MATERIAL FACTS

### A.  Background

The Warehouse was previously used as a manufacturing facility by Corning, Inc. for many years.  It is currently used by DCIS to provide warehousing and maintenance services for industrial clients.  The Warehouse covers approximately 235,000 square feet, which allows DCIS to store large-scale items used in industrial applications, such as molds for airplane tires used in the

manufacturing operations of the Goodyear Tire and Rubber Company.  At its core, DCIS's business relies on its ability to provide safe, secure storage services at the Warehouse.

Recognizing the central importance of the condition of the Warehouse to its business, DCIS contracted for and obtained a comprehensive "all risk" insurance policy from Selective (the "Policy"), the purpose of which was to provide DCIS with coverage for a variety of risks of physical loss to this property.  The Policy, assigned Policy Number S 2218036, was issued to DCIS (and other-related entities) for the time period April 1, 2016 to April 1, 2017, and was attached, in its entirety, to the Complaint and Amended Complaint as Exhibit A.  *See* DR 1-1, pp 32-372.

### B.  Windstorm Strikes Danville on July 2-3, 2016

Beginning shortly before midnight on July 2, 2016, and climaxing in the early morning hours afterward, a massive windstorm struck Danville, centering in the immediate vicinity of the Warehouse.  DR 1-3, pp 31-57, at 37, Exhibit I to Am. Compl., Forensic Weather Consultants (Howard Altschule Report of May 22, 2017), at 6.  The Warehouse experienced strong downdraft wind gusts of up to 50-60 miles per hour during a period of severe thunderstorms which occurred between 12:29 a.m. through 1:11 a.m. on July 3, 2016 and which included periods of torrential downpours.  *Id*.  Additional light to moderate and heavy rain fell between 1:18 a.m. to 4:08 a.m., resulting in an accumulation of approximately 2.76 inches of rain during that period.  *Id*.

Later, during daylight hours on the morning of July 3, 2016, Greg Chesher, the person responsible for the building maintenance of the Warehouse, went to check on the condition of the facility.  The damage caused by the windstorm was obvious, including blown-down trees and damage to the siding and flashing of the Warehouse roof.  (*See generally* Chesher Dep. 72-78 and pictures referenced therein.)[1]

---

[1]All excerpts from the Deposition of Greg Chesher are attached collectively to this Response as Exhibit A.

Chesher quickly discovered that a portion of the roof structure of the Warehouse had collapsed, causing extensive flooding to the interior of the facility.  (Chesher Dep. 80.)  Chesher was forced to react immediately, as the roof collapse resulted in broken water, electrical and gas lines.  (*Id*. 80-81.)  He contacted the City of Danville Fire Department and the City of Danville Utilities Department, which both sent units to the Warehouse that same morning and blocked all access to the structure.  (*Id*.)  Until all gas lines could be shut off and numerous other safety measures taken, it was unsafe to allow people into the Warehouse at all.  (*Id*.)  It took a comprehensive response to return the building to operational capability as DCIS worked diligently during the holiday weekend to mitigate any down time and damages. (Shackelford Dep. 64.)[2]

As part of its response to this disastrous event, DCIS immediately notified Selective that the Warehouse had suffered damage from a windstorm as required by the Policy.  (Pebbles Dep. Ex 16 ("Selective received notification of this loss on 7/5/16").)[3]  Upon receipt of this reported loss, Selective assigned claim number SELE1/5890 to this loss and sent one and then a second adjuster to the Warehouse, neither of whom were able to handle the claim as outside their authority due to their respective preliminary assessments, and, as such, loss handling was eventually assigned to James Pebbles, who has remained in charge of the claim and loss investigation since. (Shackelford Dep. 66; Pebbles Dep. 16-17.)

### C.  DCIS Works To Restart Operations, Retains Lyle Hogan To Address Necessary Repairs to the Collapse Zone

While Selective was setting up its process for claim handling, DCIS engaged Wes Baldwin of The Baldwin Company, Inc. to take the lead, on its behalf, in the insurance claim process.

---

[2]All excerpts from the Deposition of Randy Shackelford are attached collectively to this Response as Exhibit B.
[3]All excerpts from the Deposition of James Pebbles, including exhibits, are attached collectively to this Response as Exhibit C.

Almost simultaneously, DCIS retained Lyle Hogan, a structural engineer, to address the issue of temporary repairs to the collapsed area and mitigate its damages.  (Shackelford Dep. 69, 71-72.)

When Hogan was retained, water was still actively coming into the Warehouse through the existing hole in the roof in the collapse zone.  (Shackelford Dep. 72-73.)  DCIS hired Hogan to stabilize this zone from further collapse and, thus, help in returning the Warehouse to maximum functionality under the circumstances.  (*Id.*)

As Hogan acknowledged during his deposition and in his report, his involvement in the Warehouse was for the stabilization of the collapse zone.  (Hogan Dep. 97.)[4]  As part of this effort, Hogan identified the scope of the collapsed area and the extent of the damage to the collapse area, and designed and supervised temporary repairs for the purpose of the shoring up of the collapse area pending the commencement of permanent repairs.  (Hogan Dep. 98.)

Despite the limited nature of Hogan's involvement with the Warehouse to the collapse zone, which damages Selective does not contest and are not relevant to the pending Motion, Selective repeatedly sought testimony from Hogan about damage to the roof beyond the collapse zone, areas which he was not retained by DCIS to examine.[5]  Selective's attempts to paint the retention of Hogan as having anything to do with the damage at issue in the present Motion is wholly misleading.  While Hogan was actively engaged in responding to the collapse zone, DCIS was noticing the prevalence of damages to areas outside of the zone of collapse and retained Ralph

---

[4]All excerpts from the Deposition of Lyle Hogan are attached collectively to this Response as Exhibit D.
[5]Interestingly, Selective, in its internal records, identifies Hogan as "an approved vendor and amply qualified to address the cause for the failure of this structure," yet never formally identified him as such to DCIS or this Court nor communicated that it ever asked Hogan to examine areas at the warehouse outside of the collapse zone.  *See* Pebbles Dep. Ex. 16 (Serious Loss Report of 07/27/2016) (part of Exhibit C attached hereto) and Defendant's Designation of Expert Testimony (without attachments), attached as Exhibit E.

Walden and David Herring to independently assess the overall roof structure outside of the collapse zone.[6]

Although Selective solicited opinions from Hogan about issues outside of the collapse zone, Hogan repeatedly acknowledged the limitations of this speculative testimony. For instance, after speculating about the overall drainage of the roof, he acknowledged, "I haven't done a stormwater study of that whole building" and noted that his only concern as to drainage was "my opening in that roof, my collapse zone." (Hogan Dep. 23). While he speculated that wet insulation in the roof was a prior issue, he immediately acknowledged, "I didn't core sample it there" explaining that it "was not the focus of my work." (Hogan Dep. 42.) While Selective asked Hogan about his disagreement with a portion of Walden's report regarding the condition of the entire roof, Hogan clarified, "But counselor, again, understand my focus was my hole in the roof here." (Hogan Dep. 65.)

Accordingly, this Court should thus reject Selective's attempt to portray Hogan's testimony on causation or the condition of the roof beyond the collapse zone as within the scope of his review of the roof or as binding on DCIS.

### D.  DCIS Discovers Extent of Damage to Roof Beyond Collapse Zone

After the occurrence of the windstorm, DCIS began to notice that the damage to the Warehouse roof extended well beyond the area of the collapse zone. Indeed, before the windstorm occurred, Chesher, the person in charge of building maintenance including the roof, noted that leaks were infrequent occurrences at the Warehouse, occurring "[p]robably once, twice every month, possibly. It was very rare." (Chesher Dep. 11.) Chesher was very familiar with the roof, going up there on a near daily basis to ensure that the roof drains were kept free of buildup from

---

[6]The collapse zone is an area of approximately 40 ft x 48 ft. (Hogan Dep. 97.) The roof structure for the entire warehouse is actually made up of multiple roofs.

falling leaves from nearby trees.  (Chesher Dep. 12.)  Hogan described Chesher as "being on the proactive side taking care of his roof" and having "his hands on the throttle for the maintenance of the [roof]."  (Hogan Dep. 76.)  Following the windstorm, however, the number of leaks in the roof increased exponentially.  Chesher testified that he was on the roof "eight hours a day most of the time trying to keep up with the leaks."  (Chesher Dep. 43; *see also* DR 1-3, pp. 58-59, Ex J to Am. Compl., Greg Chesher's Calendar of Post-July 3, 2016 Roof Repairs (identifying 56 calendar days of repairs between July 3, 2016 and December 31, 2016).)  Indeed, Chesher had to spend so much time on the roof to repair the constant leaks following the windstorm that an additional maintenance employee had to be assigned to cover Chesher's other maintenance responsibilities. (Shackelford Dep. 63.)

As DCIS began to fear that the roof damage was much more widespread than previously understood, it retained Ralph Walden to assess "roof systems in general across the building structure."  DR 1-2, pp. 4-35, at 5, Ex. C to Am. Compl., Ralph Walden Report of October 31, 2016, at 1.  While Hogan had limited his analysis and inquiry to the collapse zone, Walden reviewed and examined the balance of the roof and this included the taking and examination of a large number of core samples.  *Id*. at pp. 5-6 and 18-21, R. Walden Rep. 10/31/2019 at 1-2 and 14-17.  Walden relied upon Chesher's knowledge and familiarity with the roof to identify areas that had previously not leaked or leaked only rarely, but now, post-July 3, 2016, suffered from significant leakage.  *Id*.  Based upon his examination, Walden identified that "open cross seams" had allowed moisture to infiltrate the roof membrane, which occurred in "areas where routinely there has been no leaking or much older leaking prior to the July storm," and opined that the wind from the storm was the precipitating and casual event for this occurrence.  *Id*.; (Walden Dep. 80).[7]

---

[7]All excerpts from the Deposition of Ralph Walden are attached collectively to this Response as Exhibit F.

Based on his review of the damage to the Warehouse and surrounding property - including disrupted metal roof edges, dislocated metal wall panel material, and blown down trees - Walden determined the "high winds associated with the July 2nd storm"[8] were among the factors in "lifting some seams of the mod-bit systems" contributing to the water intrusion in the roof.  *Id.* at 10, R. Walden Rep. 10/31/2019 at 6.

> Based on his review of the roof and relevant background information, Walden determined,
>
>> there was an unprecedented rain event, 'white out,' flooding conditions which over-ran any potential drainage on the roof systems… [creating] a water event which caused uncommon, unusual leaks across many areas of the roof and entering areas of flashings, seams, etc. which had previously not experienced such an event.

DR 1-2, pp. 36-70, at 41, Ex. D to Am. Compl., Ralph Walden Report of April 27, 2019, at 5. Walden's essential conclusion was that the

> conditions created by the rain event on July 2, 2016, placed unusual stress on the systems unlike previous rain events, creating wide spread water infiltration into the multilayered roofing systems and into the roof decking.

*Id.*  Walden testified that, by stress, he meant:

> So the more water and the more wind that a roof could normally handle, suddenly it can't handle that increased volume and that increased velocity. And when I say it can't handle it, it can't handle it perhaps in many different ways. We can go back to flashes, the drains, seams. It's just when it — when I say it puts unusual stress on the system that normally would function, suddenly it doesn't function…. That's my word stress basically.

(Walden Dep. 140-41.)   Thus, Walden concluded that the events of the windstorm caused separation of seams and other damage to the roof structures which provided the avenues for the subsequent deluge of rain water to infiltrate through the roof and into the roof insulation and elsewhere.  It is this event and resulting damage for which DCIS seeks coverage and compensation.

---

[8] Because the windstorm started in the last hour of July 2, 2016 and carried over and climaxed in intensity on July 3, 2016, the storm is sometimes identified as the "July 2nd storm" as done by Walden or the July 3rd storm as done by others.  Both references refer to the same windstorm.

Walden reviewed the conditions of the metal decking of the roof and determined that it did not exhibit signs of widespread moisture infiltration before the storm.  DR 1-2, at 38. R. Walden Rep. 04/27/17, at 2.  Walden carefully examined areas of internal surface rust to the metal decking supporting the roof and determined that chemical conditions in existence during the manufacturing activities that previously took place in the Warehouse during Corning's ownership as opposed to exterior water infiltration from the roof was the source of this condition.  *Id*. at pp 38-39, R. Walden Rep. 04/27/17 at 2-3.  Walden also reviewed surface fasteners removed from the roof, and noted that their condition did not show evidence of long-term moisture infiltration.  (Walden Dep. 230.)

### E.  Selective's Refusal to Cover Roof Damages Outside of the Collapse Zone

Despite its obligations to cover damages not expressly excluded under the terms of the Policy, Selective has refused to provide coverage for the damages outside of the collapse zone of the warehouse roof.  In so doing, Selective has refused to investigate DCIS's claims in numerous ways.  For instance, Selective continues to base much of its conclusions on a damages report it commissioned from Kim Winchell of H.B. Fishman that concluded that the damages apart from the collapse zone were attributable to the pre-existing condition of the roof, even though he based his conclusions on the erroneous assumption that there was less than an inch of rain on the date of the collapse.  (Pebbles Dep. 100.)  Pebbles' heavy reliance on Winchell's Weather Report (*see* DR 1-2, pp. 219-249 and DR 1-3, pp 1-19, Ex. F to Am. Compl., HB Fishman (Kim Winchell) Report of November 18, 2016) and his block quotes from this report in his letter of December 19, 2016 to Baldwin[9] was done notwithstanding that the weather data was generated by an individual who was not a trained meteorologist and who relied on data limited to the Danville Regional Airport, approximately eight miles northeast from the location of the loss.  (Pebbles Dep. 103-04.)

---

[9]DR 1-3, pp. 20-24, Ex. G to Am. Compl., Correspondence from James Pebbles (Selective Insurance Company of South Carolina) dated December 19, 2016.

DCIS subsequently retained Howard Altschule, a certified meteorologist[10], who submitted a report showing the full extent of the 50-60 mile per hour winds and 2.76 inches of rainfall at the date of the storm.  DR 1-3, pp. 31-57, at 37, Ex. I to Am. Compl.  DCIS also retained Stockton Infrared Thermographic Service, Inc. to prepare an Aerial Infrared Roof Moisture Survey Report on the roof, which showed the widespread water infiltration to the roof structure.  DR 1-3, pp. 63-93, Ex. L to Am. Compl., Stockton Infrared Thermographic Services Report of October 12, 2016, *passim*.  Selective has declined to consider any of this information as relevant to the present claim. (Pebbles Dep 242-43); *see also* Exhibit H to this Response, E-mail from Wes Baldwin to James Pebbles, 11/23/2016.[11]

Of further interest is Pebbles authorship of a Serious Loss Report on July 27, 2016, wherein he wrote:

> **Cause & Origin:**  The loss is the result of water collecting on the insured's roof during a windstorm causing the roof to fail and collapse.  The loss location received a significant amount of rain in a short period of time.
>
> ***
>
> **Building:**  The roof appears to have sustained wind damage to a large portion of the approximately 257,000 SF surface of the roof; direct damage to roughly 4,000 – 5,000 SF of metal decking, bar joists & steel girders.

(Pebbles Dep. Ex 16; *see also* 216-26.)

This is in stark contrast to the position that Pebbles takes in his December 19, 2016 letter mentioned above, wherein he asserts that no more than an inch of rain fell during the subject storm and any damage was confined to just the collapse zone.

## F.  Selective, For the First Time, Argues Damage Exceptions Apply

---

[10] *See* DR 1-3, pp. 25-30, Ex. H to Am. Compl., Curriculum Vitae of Howard Altschule, Certified Consulting Meteorologist.
[11] A printout of this e-mail was produced by Selective during discovery and is Bates-stamped SEL-0000227-0000229.

Selective argues, **for the first time** now three years post-incident, that it is not responsible to cover any damages to areas of the roof outside of the collapse zone based on exclusions included in the Policy.   Selective offers no explanation for the delay in identifying its reliance on these "exclusions," which could have been raised, but were not in:

1. Pebbles' letter of December 16, 2016 to Baldwin;

2. Response to the Proof of Loss filed on September 5, 2017 (in fact, no response was ever generated, thus necessitating this lawsuit);

3. Its Answers to both the Complaint and Amended Complaint.

With regard to the substance of the arguments advanced by Selective, relevant sections of the Policy are presented and analyzed in detail below.

### a. Policy Expressly Covers Damages Caused by Weight of Rain on Roof

Selective acknowledges that the damage to the collapse zone of the Warehouse is expressly covered under the terms of the Policy, which contemplates the conceptually distinct concept of "rain which collects on a roof."   Thus, as can be seen in the following cut-and-paste of Policy language, while coverage for "collapse" is initially deemed "not covered," such analysis is reversed and coverage exists if rainwater collects on a roof to the point of becoming so heavy as to cause a collapse situation or if there is a "specified causes of loss."

> We will not pay for loss or damage caused by or resulting from any of the following:
>
> k. Collapse, including any of the following conditions of property on any part of the property:
>
> (1) An abrupt falling down or caving in;
>
> (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above

But if collapse results in a Covered cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion k, does not apply:

(a) To the extent that coverage is provided under the Additional Coverage – Collapse

(b) To collapse caused by one or more of the following:
(i)     The "specified causes of loss"

….

(iii) Weight of rain that collects on a roof[.]

The definition of "specified causes of loss" expressly includes "windstorm" and "water damage."

2. "Specified causes of loss" means the following: …windstorm …; water damage.

DR 1-1, p. 279.[12]

### b. Policy Includes Limited Exclusion for Water Damage

The Policy excludes coverage for damage to a building caused by water, as specifically defined by the exclusion (as amended by endorsement), as follows:

B. Water

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

\*\*\*

4. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment[.]

DR 1-1, pp. 125 and 134.[13]

---

[12]This particular page of the policy comes from Causes of Loss – Special Form, CP 10 30 06 07 and, more particularly, Page 10 of 10. The quoted passage is from Section G. Definitions, subsection 2.

[13]The quoted language is from DR 1-1, p. 134 and comes from Water Exclusion Endorsement, CP 10 32 08 08. This endorsement replaces the exclusionary language found on DR 1-1, p. 125, more particularly B. Exclusions, 1. g. Water that is part of Causes of Loss – Special Form, CP 10 30 06 07. The water exclusion at 1.g. Page 2 of 10.

### c. Policy Includes Broadened Water Damage Coverage Extension

The Policy also includes a broadened water coverage extension that provides coverage for damage caused by the scenario contemplated by section B. 3. of the Water Exclusion Endorsement:

> You may extend the insurance provided by this Coverage Form to pay for direct loss or damage caused by:

Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment[.]DR 1-1, p. 140.[14]  Under this extension, the Policy notes that the term "drain" does not apply to the items contemplated in that exclusion which are located on the roof of a building, stating:

> For purposes of this Extension of coverage, drain does not include a roof drain, gutter, downspout or similar fixtures or equipment.

*Id.*

### LEGAL STANDARD

Summary judgment should be granted only when the pleadings, depositions, admissions on file, affidavits and other pre-trial documents show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  The moving party bears the burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  When determining whether the moving party has met its burden, the evidence must be viewed in the light most favorable to the opposing party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The Court may only grant summary judgment if it concludes that no reasonable fact-finder could possibly grant a judgment in favor of the non-moving party.  *See Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991).

---

[14]The quoted language comes from Page 6 of 30 from ELITEPAC Property Extension Manufacturers, CP 75 25VA 09 09, more particularly, Section 1 Broadened Water – Direct Damages.  On Page 5 of 30 (DR 1-1, p. 139), is the following:  "THIS ENDORESEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY."

## ARGUMENT AND AUTHORITIES

Selective has issued an "all risk" policy which provides coverage for property damage except where expressly excluded. *See*, *e.g.*, *Scottsdale Ins. Co. v. Lynnhaven Inlet Fishing Pier Corp.*, 113 F. App'x 526, 528 (4th Cir. 2004) ("They are both so-called 'all risks' policies, covering all risks of direct physical loss unless specifically excluded or limited by the policy terms."); *U.S. West, Inc. v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415, 1997 U.S. App. LEXIS 17747 (4th Cir. 1997) ("Basic coverage of these policies runs to the interests of insureds in all of specified property, insuring against 'all risks' of direct physical loss or damage to that property ... except as specific risks are then expressly excluded").

Where, as here, "an insured has shown that his loss occurred while an insurance policy was in force, but the insurer relies on exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case…." *Piankatank River Golf Club, Inc. v. Selective Ins. Co.*, 2009 U.S. Dist. LEXIS 31724 at 16 (E.D. Va. 2009) citing *Bituminous Cas. Corp. v. Sheets*, 239 Va. 332, 335, 389 S.E.2d 696, 698 (1990). Although Selective makes much of the Policy's "anti-concurrent" causation provision, this is only relevant if Selective can demonstrate that the roof damage that DCIS suffered beyond the collapse zone is subject to an express exclusion under the Policy. It cannot. Selective's attempts to push the burden of proof to DCIS under its all-risk insurance policy and short circuit this case must therefore fail.

### I.    Preliminary Issue:    Failure to Articulate Reliance on Specific Exclusions in its Answers

As noted above, the failure by Selective to raise the water and drain exclusions at any time prior to the present, but, most significantly, in its Answers to the Complaint and Amended Complaint, raises legitimate Iqbal/Twombly concerns as both the Western and Eastern Districts in Virginia have ruled that the pleading requirements established by these two cases are equally

applicable to defendants and the responsive pleadings setting forth defenses to the Complaint. It is a matter of fairness, common sense and litigation efficiency to demand the same of defendants that is required of plaintiffs and, thus, more that the mere possibility of a defense must be shown to be viable. In *Palmer v. Oakland Farms, Inc.*, 2010 U.S. Dist. LEXIS 63265, at *13 (W.D. Va. June 24, 2010), the court held that

> it neither makes sense nor is it fair to require a plaintiff to provide the defendant with enough notice that there is a plausible, factual basis for her claim under one pleading standard and then permit the defendant under another pleading standard simply to suggest that some defense may possibly apply in the case.

Similarly, in *Francisco v. Verizon South, Inc.*, 2010 U.S. Dist. LEXIS 77083, at *17 (E.D. Va. July 29, 2010), the court found that "[t]he same logic holds true for pleading affirmative defenses as for pleading claims – without alleging facts the plaintiff can't prepare adequately to respond."

In its Answer to the Amended Compliant, DR 47, ¶ 162, all Selective sets out is "that various policy exclusions apply to eliminate coverage for losses alleged" and nothing more. This does not provide sufficient notice to DCIS as to which exclusions Selective is relying upon nor, as discussed below, that Selective intended to advance an interpretation of policy language at odds with positions it had advanced and courts had accepted in case law. For its failure to comply with the requirements of *Iqbal* and *Twombly*, Selective should be procedurally barred from being able to advance the arguments in makes in support of its Motion for Partial Summary Judgment.

## II.   Selective Cannot Show Roof Damage Subject to the "Surface Water" Exclusion

Selective argues that the Policy expressly excludes damages brought about by "surface water" and asserts that the damage to the roof claimed by DCIS beyond the collapse zone are just such damages. While Selective acknowledges that "surface water" is not defined in the policy, it

notes that the term is used as one of the limited excluded causes together with a list of specified types of water damage as follows:

> Flood, **_surface water_**, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

DR 71-3, p. 45[15] (emphasis added).  Notably, Selective declines to cite to any Virginia definition of "surface water," yet relies on factually distinguishable and out-of-circuit authorities to argue that this term includes "water accumulating on buildings [and] roofs."  DCIS submits that this Court should decline to make such an unprecedented extension of the term "surface water" under Virginia law.

### A.  Surface Water Must Be Diffused Over the Surface of the Ground

Under Virginia law, "[s]urface water is defined as water diffused over the **_surface of the ground_** until it reaches some well defined channel." *Mullins v. Greer*, 226 Va. 587, 589, 311 S.E.2d 110, 111-12 (1984) (emphasis added) (quoting *Howlett v. South Norfolk*, 193 Va. 564, 568, 69 S.E.2d 346, 348 (1952)).  Indeed, in 2015, the Supreme Court of Virginia again defined "surface water" in this fashion, noting this definition has been the same since the time of common law. *Collett v. Cordovana*, 290 Va. 139, 144, 772 S.E.2d 584, 587 (2015).  Virginia's limitation of "surface water" to that occurring on the "ground" is uniformly accepted by legal treatises. *See* 93 C.J.S. *Waters* § 254 (2012) (defining "surface waters" as waters that "fall on the land from the skies or arise in springs and diffuse themselves over the **_surface of the ground_**, following in no defined course or channel" (emphasis added)); *see also* 78 Am. Jur. 2d *Waters* § 174 (2012) ("The term 'surface water' is . . . generally defined as that which is derived from falling rain or melting

---

[15] This page from the Policy can also be found at DR 1-1, p. 134.  It is titled, "Water Exclusion Endorsement" and is assigned CP 10 32 08 08.  In the lower right corner, in the version at DR 71-3, are several digits, the last three of which are "264."  It is also Exhibit 1 to Pebbles deposition and part of Exhibit C attached hereto.

snow, or which rises to the surface in springs, and is diffused over the ***surface of the ground***, while it remains in such diffused state or condition") (emphasis added); Black's Law Dictionary, 1729 (9th ed. 2009) ("Water lying on the surface of the earth but not forming part of a watercourse or lake. . . .  Surface water most commonly derives from rain, springs, or melting snow."); Couch on Ins. § 153:49 ("[A] a flood is water that escapes from a watercourse, while surface water is water diffused over the surface of the land, without forming a body of water or following a channel.").

Following this universally accepted understanding of surface water, courts have commonly held that water which diffuses over ground level man-made structures -- such as patios -- do not lose their characterization as surface water.  In *Cameron v. USAA Prop. and Cas. Ins. Co.*, 733 A.2d 965 (D.C. Ct. App. 1999), cited by Selective in its Memorandum, that court rejected the appellant's argument that water which accumulated on a patio, a man-made structure, is not surface water because it is not water on dirt.  Instead, the court reasoned that as the ground is now largely covered by man-made surfaces -- i.e., roads, water at ground level is "surface water" even though it is not on dirt.  The Court thus concluded that a "surface water" exclusion covered water which accumulated on a paved surface of the ground and flowed down a stairwell into a basement.  *See also Bao v. Liberty Mut. Fire Ins. Co.,* 535 F. Supp. 2d 532, 535-36 (D. Md. 2008) (cited by Plaintiff at DR 71, p. 15) (holding that water which diffused over ground and pooled in basement level stairwell before entering home through basement door was surface water).  Indeed, as Selective notes in its Memorandum, a Virginia state court, *Dent v. Allstate Indem. Co*., 82 Va. Cir. 386, 390-91 (Fairfax Cir. Ct. 2011) "under facts which are practically indistinguishable from [*Cameron*]," relied on this holding to determine that water which flowed along the surface of the ground and pooled at the bottom of a set of stairs leading to a homeowner's basement was "surface water."

## B. Courts Have Routinely Declined to Apply "Surface Water" Exclusions to Rain Which Accumulates on a Roof

Although courts have found that water diffusing over ground-level man-made structures constitutes surface water for purposes of similar insurance exclusions, they have routinely declined to extend definition to include water which accumulates on structures far above the surface of the ground. In fact, the District Court for the Middle District of Louisiana recently declined to make this extension in nearly identical factual circumstances to the case at bar. In *La. Mid-Continent Oil & Gas Ass'n v. Peerless Ins. Co.*, No. 17-01098-BAJ-EWD, 2019 U.S. Dist. LEXIS 45648, at *5-9 (M.D. La. Mar. 18, 2019), Peerless Insurance sought to apply an identical surface water exclusion to avoid paying for damage caused by water 8-10 inches deep that accumulated on a flat roof following a severe rain storm after the roof drain had become clogged by a clump of leaves. In denying the insurer's motion for summary judgment, the court looked to the "plain language of the policy itself," which excluded water damage as a result of "flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water or their spray, and all whether driving by wind." In reviewing this list, the court noted that the "phrase 'surface water' is listed among a group of terms that generally refer to the accumulation of water on the ground versus water on the roof of a building". *Id.* at *6. The court further relied on *Cochran v. Traveler's Ins. Co.*, 606 So.2d 22 (La. Ct. App. 1992), a case with nearly identical facts, at that court looked to the commonly accepted definition of "surface water" as "water occurring generally on the surface of the earth," and concluded that the "surface water" exclusion of an all-risk insurance policy did not include rainwater overflow on top of a roof. *Id.*[16]

---

[16]Notably, both *La. Mid-Continent Oil & Gas Ass'n*, 2019 U.S. Dist. LEXIS 45648, at *5-6, and *Cochran*, 606 So.2d at 25, expressly distinguished the holding of *Sherwood Real Estate and Inv. Co. v. Old Colony Ins.*, 234 So.2d 445, 44748 (La. Ct. App. 1970), that "water collected upon the roof of a building is 'surface water'" (which Selective relies upon in its Memorandum) as dicta and inapplicable to their disputes because *Sherwood Real Estate* dealt with a limited windstorm damage policy as opposed to an all-risk insurance policy involved their respective cases.

Ironically, Selective has actually argued against the exact extension of the term "surface water" that it now asks this Court to adopt.  Seeking to avoid coverage obligations under a policy providing coverage for "surface water," Selective argued that a holding that accumulated rainwater on an elevated roof deck constituted surface water would be an "absurd result" and would render the word "surface" superfluous in "surface water."  Id.  Thus, in *Flamingo S. Beach I Condo. Ass'n v. Selective Ins. Co.*, 492 F. App'x 16, 18-20 (11th Cir. 2012), in agreeing with Selective, the Eleventh Circuit  held that heavy rainwater that accumulated on an elevated deck and entered the lobby of a condominium was not surface water under the terms of an insurance policy.  In that decision, the Court noted that cases like *Cameron*, "did not involve water pooled on a surface significantly elevated from the surface of the ground."  *Id*. at 20.  The Court went on to hold that "[n]one of these common definitions of "surface waters" would encompass water that pooled on the surface of Flamingo's deck," and upheld summary judgment for Selective.   *Id.*

Other courts around the country have likewise held that "surface water" does not include water which accumulates on the surface of a roof.  *See McCorkle v. Penn Mut. Fire Ins. Co.*, 213 So.2d 272, 283 (Fla. App. 1968) (holding that definition of "surface water" and cases from around the country could not support application of "surface water" exclusion for rain water which accumulated on roof because of drain clogged with pine needles); *Aetna Fire Underwriters Ins. Co. v. Crowley*, 207 S.E. 2d 666, 668 (Ga. Ct. App. 1974) (holding "majority of cases apply "surface water" strictly to water on surface of ground and not rainwater falling on and flowing from roof of insured dwelling"); *Cross Queen v. Director, Fed.* Emergency, 516 F. Supp. 806, 808 (D.V.I. 1980) (holding "damage from rainwater which fell on the insured's roof and flowed into the insured's dwelling" was not caused by surface waters because surface waters are defined as those that diffuse themselves over the surface of the earth).

Taking a different approach to the analysis to the issue of the interplay of rain water to surface water and, thus, exclusionary language in an insurance policy, the court in *Easy Sportswear v. American Economy Ins.*, Civil Action No. 05-1183, at 12-13 (W.D. Pa. Nov. 21, 2007), found the absence of the word "rain" within the exclusionary provision and from any definition of water in the policy to be telling.  Consequently, it held that

> because the policy does not explicitly include 'rain', under the canon of construction, *expression unuis est exclusion alterius*, the Court does not interpret this 'water' provision to include rain.  Hence, the Court finds that this exclusion does not apply to the facts at hand.

*Id.* at *13.

The cases which Selective cites for the proposition that "surface water" encompasses rain which has accumulated on a roof are distinguishable from the present case.  In *Fidelity Coop. Bank v. Nova Cas. Co.*, 726 F.3d 31, 40 (1st Cir. 2013), the First Circuit declined to "disturb the district court's finding that the 'ponded' water on the roof of the property here was 'surface water,'" but held that, based on this factual determination, the district court had incorrectly excluded coverage under a "surface water" exclusion because the insured had broadened water coverage for damage caused by "surface water."   This holding does not help Selective's attempt to prove that accumulated water on a roof is excluded by a "surface water" exclusion as here.   Nor does *Bringhurst v. O'Donnell,* 14 Del. Ch. 225, 230-31, 124 A. 795, 797-98 (1924), wherein the court held, in an easement dispute between the owners of adjacent lots which were completely covered by buildings, that the parties must have meant the term "surface water" to include "water falling on the roof" when they inserted an easement reservation in the title deeds.   *Id.*  Delaware courts have declined to extend this holding to fashion a surface water exclusion that includes rain falling on a roof.   *See Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, No. 08C-11-065 MMJ, 2010 Del. Super. LEXIS 140, at *2 (Super. Ct. Apr. 8, 2010).

Additionally, *Martinez v. Am. Family Mut. Ins. Co*., 413 P.3d 201, 202 (Colo. App. 2017), did not involve the build-up of any rain on a roof; rather the court found that water which had flowed off of the roof during a hailstorm and pooled at the base of Martinez's window wells before entering the home was, at the time of entry, "surface water" for the purposes of a damage exclusion.

### C. Any Ambiguities in the "Surface Water" Exclusion Must Be Construed Against Selective

Ambiguity exists if the policy language is reasonably susceptible to two different interpretations. *See, e.g., Builders Mut. Ins. Co. v. Parallel Design & Dev. LLC*, 785 F. Supp. 2d 535, 543 (E.D. Va. 2011) ("Language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time"). If ambiguity exists, the policy must be construed in favor of coverage. *See, e.g., Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) ("when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured"); *U.S. West., Inc.*, 117 F.3d 1415, 1997 U.S. App. LEXIS 17747, at *8 ("under Virginia law, as generally, where an insurance policy's coverage turns on the interpretation and application of policy exceptions and exclusions of doubtful or ambiguous meaning, they are to be construed narrowly in favor of the insured").

Should this Court decide to make Selective's proposed extension of "surface water" to include rain water that accumulated on a roof, it should decline to enforce the exclusion as ambiguous under the Policy. Selective has acknowledged its liability for the collapse zone, as the collapse was caused by the "[w]eight of rain that collects on a roof." The Policy, thus, expressly contemplates "rain that collects on a roof" as something other than "surface water." As such, if "surface water" includes "rain that collects on a roof," the Policy's treatment of

"rain that collects on a roof" as itself an express concept creates a justifiable understanding that it is not "surface water" under the Policy.  Notably, none of the limited cases which have extended the definition of "surface water" to "rain that collects on a roof" have involved a collapse at all, much less a provision which separately and distinctly refers to the concept apart from "surface water."  *See Oak Hill Inv. IV LLC v. State Farm Fire & Cas.,* 2017 WL 4286779 (N.D. Ohio 2017) (finding surface water exclusion to include rain that had accumulated on a roof due to a clogged drain and which flowed through completely undamaged air conditioning ducts causing building damage).  Thus, the conflict between such a provision and the broad conception of "surface water" proposed by Selective is an issue of first impression and should be decided against Selective.

Here, the "[w]eight of rain that collects on a roof" is clearly a covered cause within the express terms of the collapse exclusion of the Policy.  This does not involve an additional collapse coverage endorsement such as the one addressed in *Lower Chesapeake Assocs. v. Valley Forge Ins. Co*., 260 Va. 77, 87-88; 532 S.E.2d 325, 331-32. (2005).  While examining specific exclusions applicable to collapse coverage, that court found that the "policy language permit[ed] more than one reasonable interpretation" and was thus ambiguous.  *Id*. at 88, 532 S.E.2d at 332.  In refusing to apply the exclusion, the court held "exclusionary provisions are ambiguous, such that they may be understood in more than one way," and Virginia courts "will interpret the policy in a manner that provides coverage."  Id. at 88; 532 S.E.2d at 331-32 (2005) (citing *S.F v. West Am. Ins. Co.*, 250 Va. 461, 465, 463 S.E.2d 450, 452 (1995)).  At a minimum, the express reference to "rain that collects on a roof" gives rise to a similar "reasonable interpretation" that it is not "surface water" under the Policy, and this Court should thus decline to apply the "surface water" exclusion in the present case.

### III. The Drain Exclusion is Inapplicable to the Present Case

It is notable that, while Selective repeatedly references the "drain" exclusion in its Memorandum, it does not appear to argue that it applies to bar coverage in the present case. Instead, it appears to solely take the position that the "Broadened Water Coverage Extension" does not provide coverage for the claim at issue as it expressly excludes coverage for "roof drains."   While DCIS does not seek coverage under this coverage extension, DCIS, nonetheless, notes that Selective cannot show that the damage DCIS suffered is excluded from coverage by the "drain" provision.

The portion of the Water Exclusion containing the "drain" provision excludes from coverage property damage caused by:

> B. 3.   Water that **backs up** or **overflows** or is **otherwise discharged from** a sewer, drain, sump, sump pump or related equipment;

(emphasis added).  DR 71-3, p. 45.[17]  Assuming *arguendo* that this provision applies to roof drains such as those on the Warehouse roof, Selective cannot establish that the water which accumulated on the roof "back[ed] up," "overflow[ed]" or was "otherwise discharged from" such a drain.

Chesher, the person responsible for maintenance of the roof at the Warehouse, drafted a letter on April 5, 2017 that recorded his observations about the roof immediately following the windstorm.  More particularly, he wrote:

> The **drains were also covered in 'green' leaves that came from our trees due to the high winds**.  Therefore, the roof retained an extensive amount of water and could not drain properly, possibly not at all.

(Chesher Dep. 62-63 and Exhibit G to this Response[18]) (emphasis added).

---

[17]This page from the Policy can also be found at DR 1-1, p. 134.  It is titled, "Water Exclusion Endorsement" and is assigned CP 10 32 08 08.  In the lower right corner, in the version at DR 71-3, are several digits, the last three of which are "264."  It is also Exhibit 1 to Pebbles deposition and part of Exhibit C attached hereto.
[18]Exhibit G is the actual letter drafted by Chesher and is dated 04/05/2017.

Indeed, Chesher was familiar with how the leaves from the pin oak trees surrounding the Warehouse affected its roof drains because he had to go on the roof "[j]ust about every day," as he was the only person who cleaned the leaves out of the drains.  (Chesher Dep. 12.)  Chesher went on to explain that cleaning these leaves was necessary because it would completely prevent water from entering the drain, as opposed to backing up from the drain.

> Q.  And so during the storm, those drains backed up?
>
> **A.  If you didn't keep them clean, they would not drain. They wouldn't back up.**
>
> Q.  Well, if I'm reading your letter correctly, the drains didn't allow water in during the storm, and that's what caused the roof to collapse; right?
>
> **A.  If the drain — there was green leaves around the drain, but if it had completely stopped it up, it should have still never failed.**

(Chesher Dep. 65.)

The only probative evidence present in the record before this Court is that the roof drain became blocked during the windstorm event on July 3, 2016, thereby preventing rain water that fell on the roof of the Warehouse to flow into and through the roof drains.  There is no evidence, first-hand or otherwise, suggesting that rain water had entered into the drain and then was disgorged out back onto the roof via a back-up, overflow or discharge scenario.

Based on this uncontradicted testimony alone, Selective cannot show that the "drain" exclusion precludes coverage in the present case.  In fact, Selective's own "surface water" cases counsel this result.  *See Oak Hill Inv*. IV LLC at *4 (holding exclusion did not apply where roof drain clogged by leaves as reasonable interpretation of policy requires water to come from drain as opposed to being diverted from entering drain); *Dent*, 82 Va. Cir. at 386 (noting dispute in case law as to whether water must reverse its flow to satisfy exclusion, but that exclusion did not apply to blocked drain because "[a]t least some water must enter the drain or pipe for the [exclusion]

language to apply."); s*ee also Tran v. Seneca Ins. Co.*, No. 14-5491, 2015 U.S. Dist. LEXIS 139527, 2015 WL 5964996 (E.D. Pa. Oct. 14, 2015) (finding four alternate reasonable interpretations for the same language as that currently at issue, and declining to find exclusion applicable as ambiguous).

As such, there is no record evidence otherwise that supports a conclusion that water backed up from the drain as contemplated by the Policy.  Notably, while Ralph Walden concluded that the "white-out," flooding conditions overran any potential drainage on the roof systems," he was not able to reach a conclusion about whether the drains actually "backed up" or similarly discharged water as required by this exclusion:

> Q.   Did the drains back up? Was the volume of water so great that it overwhelmed the drainage?  What were your conclusions in that regard?
>
> A.   **I did not reach a conclusion on what you just asked… Specifically about the drainage system itself with regard to the piping and backups, I did not reach a conclusion on that.**

(Walden Dep. 52-53.)  Similarly, Hogan testified that he did not do "a stormwater study of the whole [Warehouse]" as he was concerned only about whether the collapse zone was draining correctly.  (Hogan Dep. 23).  Pebbles, when pointedly asked to identify any factual findings that would support the notion that the roof drains overflowed or discharged, was not able to do so. (Pebbles Dep. 159-168.)  It therefore seems that Selective cannot meet its burden to "prove that the [drain] exclusion applies to the facts of the case" and any attempt to exclude coverage for the roof damage on this basis must fail.  *Piankatank River Golf Club*, 2009 U.S. Dist. LEXIS 31724 at 16.

## CONCLUSION

For the reasons stated above, DCIS respectfully requests that the Court deny Selective's Partial Motion for Summary Judgment.

Respectfully submitted,

DANVILLE COMMERCIAL INDUSTRIAL STORAGE, LLC

By:  /s/            Joshua F. P. Long                               .
                              Of Counsel

Anthony H. Monioudis, Esq.  (VSB 32691)
Anthony H. Monioudis, Esq., PLC
126 South Market Street
Danville, VA 24541
Telephone:      434-797-8202
Facsimile:      434-835-2590
E-Mail:          anthony@ahmplc.com

Joshua F.P. Long, Esq. (VSB 65684)
WOODS ROGERS PLC
PO Box 14125
Roanoke, VA 24038-4125
Telephone:      540-983-7725
Facsimile:      540-983-7711
E-mail:          jlong@woodsrogers.com

Counsel for Plaintiff Danville Commercial Industrial Storage, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record:

By:  /s/ _____      Joshua F. P. Long_____
                              Of Counsel