CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA.
FILED

MAR 0 4 2020

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

|  |  |  |
|---|---|---|
| DANVILLE COMMERCIAL INDUSTRIAL STORAGE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 4:18-cv-00050 |
| v. | ) ) ) | |
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, | ) ) ) | By:   Hon. Michael F. Urbanski   Chief United States District Judge |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter comes before the court on defendant Selective Insurance Company of South Carolina's ("Selective") Motion for Partial Summary Judgment. ECF No. 70. In its motion, Selective contends that certain exclusions in its general insurance policy, issued to plaintiff Danville Commercial Industrial Storage, LLC ("DCIS"), apply to a property damage claim asserted by DCIS as a result of a violent storm in July, 2016. The court heard argument on October 2, 2019. After a review of the pleadings, arguments of the parties, relevant evidence, and applicable law, the court will grant Selective's Motion for Partial Summary Judgment.

### I.

DCIS owns a warehouse located at 265 Corning Drive in Danville, Virginia. On April 1, 2016, DCIS entered into a commercial property insurance policy with Selective ("the Policy"), which obligated Selective to "pay for direct physical loss or damage to [the] Covered

Property at the premises . . . caused by or resulting from any Covered Cause of Loss." ECF

No. 71-3, Bates No. POL-0000225. The Policy was in effect for one year.

The insurance policy included several exclusions. First, the Policy stated that Selective

would not pay for any "loss or damage caused directly or indirectly" by:

> g. Water
>> (1) Flood, surface water, waves, tides, tidal waves, or their spray, all whether driven by rain or not;
>> (2) Mudslide or mudflow;
>> (3) Water that backs up from or overflows from a sewer, drain or sump; or
>> (4) Water under the ground surface pressing on, or flowing or seeping through;
>>> (a) Foundations, walls, floors, or paved surfaces;
>>> (b) Basements, whether paved or not; or
>>> (c) Doors, windows or other openings.

Id. A further endorsement provided:

> **Broadened Water – Direct Damage**
>
> You may extend the insurance provided by this Coverage Form to pay for direct loss or damage cause by:
>> a. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump pump or related equipment; or
>> b. Water under the ground surface pressing on, or flowing or seeping through foundations, walls, floors or paved surfaces.
>
> However, with respect to Paragraph **b.** above, we will not pay the cost of repairing or replacing a sump pump or its related equipment in the event of a mechanical breakdown.
>
> For purposes of this Extension of coverage, drain does not include a roof drain, gutter, downspout or similar fixtures or equipment.

ECF No. 71-3, Bates No. POL-0000270.

Late in the evening of July 2, 2016 (or in the early morning hours of July 3), a severe storm inundated Danville and the surrounding areas, dropping a large volume of rain in a relatively short period of time. The storm and its rain overwhelmed the roof drains on DCIS's warehouse, causing water to collect, or "pond," on the roof. As a result, a section of the roof, totaling between 2000 and 2500 square feet, collapsed under the weight of the ponded water. The remainder of the roof did not collapse but was damaged by water infiltration.

DCIS filed a claim for the damages it sustained at its warehouse. While Selective concedes the Policy covers collapse caused by the weight of water collected on the roof, it disputes that the Policy requires it to cover replacement of the entire roof. DCIS brought suit to enforce its interpretation of the Policy, and Selective has now moved for partial summary judgment, seeking to confirm its interpretation of the Policy.

## II.

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990) (citing Anderson, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue

as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe, Inc., 955 F.2d 242, 244 (4th Cir. 1992).

When considering summary judgment regarding the interpretation of a contract, the court "faces a conceptually difficult task . . . ." Id. at 245.

> Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible to two reasonable interpretations.' Am. Fidelity & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965). The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respective the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

Id. (internal citation omitted).

## III.

As an initial matter, DCIS contends that Selective is barred from asserting the applicability of the exclusion as a defense to the present action because the specific language of the Policy was not cited as a grounds for defense in Selective's answer. DCIS maintains that the boilerplate defense asserted by Selective—"various policy exclusions apply to eliminate coverage for the losses alleged," ECF No. 47 ¶ 162—is insufficient to put DCIS on notice of

Selective's defense to its claims. The court finds that Selective's affirmative defense was sufficient to put DCIS on notice that Selective would rely on exclusions in the Policy as a defense to DCIS's claims. Even if it were not, DCIS sought further information on the basis for Selective's affirmative defense during discovery, and Selective cited the relevant Water Exclusion Endorsement as grounds for its affirmative defense as early as March 28, 2019. See ECF No. 89-3. Selective's affirmative defense is not waived, and Selective may rely on the Water Exclusion Endorsement as an affirmative defense to DCIS's claims.

Turning to the heart of the issue before the court, Selective makes two primary arguments in support of its motion for partial summary judgment. First it contends that the Water Exclusion Endorsement, which excludes from coverage damage caused by "surface water," ECF No. 71-3, Bates No. POL-0000255, applies to water that ponded on the roof. Second, it maintains the inability of the roof drains to accommodate the deluge of water dumped during the storm amounted to "water back[ing] up or overflow[ing] from a . . . drain," causing damage that was expressly excepted from coverage by the Policy. Because the court is persuaded that the term "surface water," as used in the Policy, includes ponded or standing water on a roof, Selective is entitled to summary judgment on its initial argument, and the court need not address its alternative position.

There is no dispute that the Policy is a contract, and thus the normal rules of contractual interpretation guide the court's analysis of the issues before it. See Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 419 (4th Cir. 2004) ("[P]ursuant to Virginia jurisprudence, an insurance policy is a contract to be construed in accordance with the principles applicable to all contracts." (citing Graphic Arts. Mut. Ins. Co. v. C.W. Warthen

Co., 240 Va. 457, 459, 397 S.E.2d 876, 877 (1990))). "Questions concerning the validity, effect and interpretation of a contract are resolved according to the law of the state where the contract was made." Id. (citing Woodson v. Celina Mut. Ins. Co., 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970)). The parties appear to agree that Virginia law controls the Policy, and the court sees no reason to disturb that concession.

"Under Virginia law, if policy language is clear and unambiguous, [the court does] not apply rules of construction; rather, [it] give[s] the language its plain and ordinary meaning and enforce[s] the policy as written." Id. (citing P'ship Umbrella, Inc. v. Fed. Ins. Co., 260 Va. 123, 133, 530 S.E.2d 154, 160 (2000)). "Conversely, when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be strictly construed against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured." Id. (citing St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984)). Policy language will be held to be ambiguous "when it may be understood in more than one way or when such language refers to two or more things at the same time." Salzi v. Va. Farm Bureau Mut. Ins. Co., 263 Va. 52, 55–56, 556 S.E.2d 758, 760 (2002); see also Horace Mann Ins. Co. v. Barney, No. 2:17cv00016, 2018 WL 1733989, at *2 (W.D. Va. Apr. 10, 2018). "Similarly, reasonable exclusions to coverage, when stated in the policy in clear and unambiguous language that is clearly applicable to a specific situation at hand, will be enforced." Id. (citing Transcon. Ins. Co. v. RBMW, Inc., 262 Va. 502, 512, 551 S.E.2d 313, 318 (2001)). "Where exclusionary provisions are ambiguous, they will be interpreted in a manner that provides coverage to the

insured." Id. (citing Lower Chesapeake Assocs. v. Valley Forge Ins. Co., 260 Va. 77, 87–88, 532 S.E.2d 325, 331–32 (2000)).

The Policy clearly excludes from coverage damage cause by "surface water," but that term is not defined in the Policy. Selective insists the term includes water on surfaces other than the ground, while DCIS argues that, giving the term "surface water" its plain meaning, water on a roof does not qualify. While Virginia courts have not addressed what the term "surface water" means in an insurance contract, other courts around the country have. As Selective accurately points out, the majority of those to have addressed this question have concluded that "surface water" includes water on a roof. See, e.g., Fidelity Co-op. Bank v. Nova Cas. Co., 726 F.3d 31, 40 (1st Cir. 2013) ("[W]e see no reason to disturb the district court's finding that the 'ponded' water on the roof of the property here was 'surface water.'"); Oak Hill Inc. IV LLC v. State Farm Fire & Cas. Co., No. 15-cv-1996, 2017 WL 4286779, at *4 (N.D. Ohio Sept. 27, 2017) ("Neither the Ohio definition for the majority of case law, including that in Ohio and the Sixth Circuit, require 'surface water' to be defined so narrowly as only water that lands on the dirt. The water at issue here 'derived from falling rains.' . . . I find the rainwater that accumulated on the roof to be 'surface water' excluded under the Policy."); Martinez v. Am. Family Ins. Co., No. 16-ca-0456, 2017 WL 526121, at *5–6 (Colo. App. Feb. 9, 2017) (finding "ground" within the definition of "surface water" to include man-made surfaces including the roof at issue in the case); Sherwood Real Estate & Inv. Co. v. Old Colony Ins., 234 So. 2d 445, 446 (La. Ct. App. 1970) (holding that a pool of rainwater on a roof was "surface water"); Bringhurst v. O'Donnell, 14 Del. Ch. 225 (1924) ("In the case of a building erected on land, the roof is to be regarded as an artificial elevation of the earth's

surface. When it intercepts the falling rain or snow, it therefore gathers surface waters."). The court finds this reasoning persuasive and holds that the plain meaning of "surface water" in the Policy includes water that ponds on a roof.

DCIS contends that "surface water" only applies to water on the ground. Although DCIS's minority position has been adopted by a few courts, see, e.g., Cochran v. Travelers Ins. Co., 606 So.2d 22, 24 (La. Ct. App. 1992), the Policy at issue here makes such a reading untenable. In the very exclusion at issue, the Policy states that Selective will not pay for damage caused by "[w]ater under the ground surface pressing on, or flowing or seeping though" foundations, walls, floors, or paved surfaces. ECF No. 71-3, Bates No. POL-0000255. The Policy expressly further defines a *type* of surface, namely the "ground surface," establishing that "surface," as used elsewhere in the Policy (and especially in the very same exclusion), includes surfaces other than just the ground. To hold as DCIS insists would make the term "ground" superfluous in the Policy, and contracts are presumed not to use superfluous terms. See Ames v. Am. Nat'l Bank, 163 Va. 1, 38–39, 176 S.E. 204, 216–17 (1934) ("No word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it. . . . The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition."). Reading the exclusion as a whole confirms that "surface water" means more than merely water on the ground; "surface water" includes water on a surface other than the ground as well.

DCIS also points to several Virginia water rights cases for the proposition that "[s]urface water is defined as water 'diffused over the surface of the ground . . . until it reaches

some well[-] defined channel.'" Mullins v. Greer, 226 Va. 587, 588–89, 311 S.E.2d 110, 111–12 (1984) (quoting Howlett v. S. Norfolk, 193 Va. 564, 567, 69 S.E.2d 346, 348 (1952)). See also Collett v. Cordovana, 290 Va. 139, 144, 772 S.E.2d 584, 587 (2015) (quoting Mullins, 311 S.E.2d at 111–12). These cases, however, are not persuasive for several reasons.

First, neither case cited by DCIS turned on the definition of "surface water;" both merely applied the common-law rule that "each landowner may fight [surface water] off as best he can . . . ." Mullins, 311 S.E.2d at 112; see Collett, 772 S.E.2d at 587. Second, both cases apply common-law definitions and rules to situations wholly distinct from the contractual interpretation at bar. Both Mullins and Collett concerned whether landowners could divert surface water away from their own property and towards another, causing damage to the neighboring property. See Mullins, 311 S.E.2d at 111 ("[Defendants] allege that Mullins had erected an earthen embankment obstructing and diverting a stream, which caused large quantities of water to be discharged on their lands."); Collett, 772 S.E.2d at 586 ("Collett alleged . . . that the Cordovanas . . . were 'responsible for directing massive quantities of water run-off and pollutants from their properties onto [Collett's] property, thus causing significant and ongoing damage, financially and emotionally.'"). Neither case cited by DCIS concerned the interpretation of an insurance contract, so the applicability of Mullins and Collett to the case at bar is negligible at best.

Finally, even if the common-law definition of "surface water" as cited in unrelated cases were compelling or controlling, there is still the more fundamental issue that the court is interpreting a contract. It is axiomatic that, when interpreting and applying a contract, the intention of the parties is the controlling concern. Va. Elec. & Power Co. v. N. Va. Reg. Park

Auth., 270 Va. 309, 315, 618 S.E.2d 323, 326 (2005) ("[T]he pole star for the construction of a contract is the intention of the contracting parties as expressed by them in the words that have used. . . . It is the court's duty to declare what the instrument itself says it says." (quoting Ames, 176 S.E. at 216)). This is so even if the intention of the parties runs counter to the general rule. See, e.g., Rountree v. Graham, 144 Va. 145, 148, 131 S.E. 193, 194 (1926) ("The operation of this general rule is, however, subordinate to the intention of the parties . . . ."). As discussed above, the words used by the parties establish that "surface" includes more than just the ground, and it follows that "surface water" includes water that pools on a surface other than the ground, namely the roof of DCIS's warehouse.

Based on the foregoing, insofar as DCIS seeks recovery from Selective for damage caused by ponded water infiltrating the roof, that damage is excluded by the Policy and Selective is entitled to summary judgment on that issue.

## IV.

Selective has also filed a Motion to Exclude Expert Testimony of Danny Knight. ECF No. 76. DCIS responds that, because Mr. Knight "is experiencing serious health issues making his ability to provide any testimony in this matter unlikely at best, DCIS recognizes that it will not be able to rely upon him as an expert going forward." ECF No. 83. Accordingly, DCIS contends the issue is moot. Selective disagrees, arguing that until his expert designation is rescinded, DCIS assertion that it "will not be able to rely upon [Knight] as an expert going forward" is insufficient and does not "moot" the issue it has raised. See ECF No. 84. Based on DCIS's concession that it does not foresee relying on Knight's testimony, as well as its lack

of a response to the grounds raised in support of Selective's motion to exclude, the court **GRANTS** Selective's motion to exclude Knight's testimony.

## V.

For the reasons stated above, Selective may properly rely on the Water Exclusion Endorsement as an affirmative defense to DCIS's claim, and that exclusion applies to water damage caused by ponded water infiltrating the roof. Therefore, the court **GRANTS** Selective's Motion for Partial Summary Judgment.

An appropriate Order will be entered.

Entered: 03—03—2020

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge